**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

DANNY DONOHUE, as President of the
Civil Service Employees Association, Inc.,
Local 1000, AFSCME, AFL-CIO; CIVIL
SERVICE EMPLOYEES ASSOCIATION,
INC., LOCAL 1000, AFSCME, AFL-CIO;
WILLIAM COLEMAN, individually and on
behalf of all others similarly situated; WILLIAM
MILLER, individually and on behalf of all others
similarly situated; JOHN METZGIER, individually
and on behalf of all others similarly situated; and JACK
WIEDEMAN, individually and on behalf of all others
similarly situated,

Plaintiffs,

v.

1:13-CV-918
(FJS/CFH)

THOMAS J. MADISON, JR., individually and in his
official capacity as Executive Director of the New York
State Thruway Authority and the New York State Canal
Corporation; CARLOS MILAN, in his official capacity as
Director of Employee Relations and Employee Safety,
New York State Thruway Authority and New York
State Canal Corporation; BRIAN U. STRATTON, in his
official capacity as Director of the New York State Canal
Corporation; HOWARD P. MILSTEIN, individually and
in his official capacity as Chairman of New York State
Thruway/Canal Corporation Board of Directors; E. VIRGIL
CONWAY, in his official capacity as Board Member of the
New York State Thruway/Canal Corporation Board of
Directors; NEW YORK STATE THRUWAY AUTHORITY;
NEW YORK STATE CANAL CORPORATION; DONNA J.
LUH, in her official capacity as Vice-Chairman of New York
State Thruway/Canal Corporation Board of Directors;
RICHARD N. SIMBERG, in his official capacity as Board
Member of the New York State Thruway/Canal Corporation

- 1 -

Board of Directors; BRANDON R. SALL, in his official
capacity as Board Member of the New York State Thruway/
Canal Corporation Board of Directors; J. DONALD
RICE, JR., in his official capacity as board Member of
the New York State Thruway/Canal Corporation Board of
Directors; and JOSE HOLGUIN-VERAS, in his official
capacity as Board Member of the New York State
Thruway/Canal Corporation Board of Directors,

**Defendants.**

---

DANNY DONOHUE, as President of the
Civil Service Employees Association, Inc.,
Local 1000, AFSCME, AFL-CIO; CIVIL
SERVICE EMPLOYEES ASSOCIATION,
INC., LOCAL 1000, AFSCME, AFL-CIO;
JOHN DELLIO, individually and on behalf of all
others similarly situated; MICHAEL BOULERIS,
individually and on behalf of all others similarly
situated; MAUREEN ALONZO, individually and on
behalf of all others similarly situated; and MARCOS
DIAMANTATOS, individually and on behalf of all others
similarly situated,

**Plaintiffs,**

v.

1:13-CV-920
(FJS/CFH)

THOMAS J. MADISON, JR., individually and in his
official capacity as Executive Director of the New York
State Thruway Authority and the New York State Canal
Corporation; CARLOS MILAN, in his official capacity as
Director of Employee Relations and Employee Safety,
New York State Thruway Authority and New York
State Canal Corporation; HOWARD P. MILSTEIN,
individually and in his official capacity as Chairman of New
York State Thruway/Canal Corporation Board of Directors;
E. VIRGIL CONWAY, in his official capacity as Board
Member of the New York State Thruway/Canal Corporation

Board of Directors; NEW YORK STATE THRUWAY
AUTHORITY; JOSE HOLGUIN-VERAS, in his official
capacity as Board Member of the New York State Thruway/
Canal Corporation Board of Directors; DONNA J. LUH,
in her official capacity as Vice-Chairman New York State
Thruway/Canal Corporation Board of Directors; J. DONALD
RICE, JR., in his official capacity as Board Member of New
York State Thruway/Canal Corporation Board of Directors;
BRANDON R. SALL, in his official capacity as Board
Member of New York State Thruway/Canal Corporation
Board of Directors; and RICHARD N. SIMBERG, in his
official capacity as Board Member of New York State
Thruway/Canal Corporation Board of Directors,

Defendants.

---

NEW YORK STATE THRUWAY EMPLOYEES
LOCAL 72; JOSEPH E. COLOMBO; GEORGE E.
SAVOIE; and DAVID M. MAZZEO, individually and on
behalf of all others similarly-situated,

Plaintiffs,

v.                                    1:14-CV-1043
                                                               (FJS/CFH)

NEW YORK STATE THRUWAY AUTHORITY;
HOWARD P. MILSTEIN, individually and in his official
capacity as Chairman of the New York State Thruway
Authority; THOMAS J. MADISON, JR., individually and
in his official capacity as Executive Director of the New
York State Thruway Authority; THOMAS RYAN, in his
official capacity; E. VIRGIL CONWAY, in his official
capacity as Board Member of the New York State Thruway
Authority; JOHN F. BARR, in his official capacity as Director
of Administrative Services of the New York State Thruway
Authority; JOHN M. BRYAN, in official capacity as Chief
Financial Officer and Treasurer of the New York State
Thruway Authority; DONNA J. LUH, in her official capacity
as Vice-Chair of the New York State Thruway/Canal

Corporation Board of Directors; J. DONALD RICE, JR., in
his official capacity as Board Member of the New York State
Thruway Authority; BRANDON R. SALL, in his official
capacity as Board Member of the New York State Thruway
Authority; RICHARD N. SIMBERG, in his official capacity
as Board Member of the New York State Thruway Authority;
and JOSE HOLGUIN-VERAS, in his official capacity as
Board Member of the New York State Thruway Authority,

Defendants.

_____

APPEARANCES                                OF COUNSEL

**CIVIL SERVICE EMPLOYEES**                **AARON E. KAPLAN, ESQ.**
**ASSOCIATION, INC.**                      **JENNIFER C. ZEGARELLI, ESQ.**
143 Washington Avenue
P.O. Box 7125, Capitol Station
Albany, New York 12224
Attorneys for Plaintiffs

**LIVINGSTON ADLER PULDA**                 **GREGG D. ADLER, ESQ.**
**MEIKLEJOHN & KELLY**                     **NICOLE M. ROTHBERG, ESQ.**
557 Prospect Avenue
Hartford, Connecticut 06105
Attorneys for Plaintiffs

**DREYER, BOYAJIAN LLP**                   **BENJAMIN W. HILL, ESQ.**
75 Columbia Street                         **WILLIAM J. DRYER, ESQ.**
Albany, New York 12210
Attorneys for Defendant Madison

**WHITEMAN, OSTERMAN &**                   **BETH A. BOURASSA, ESQ.**
**HANNA**                                  **CHRISTOPHER W. MEYER, ESQ.**
One Commerce Plaza                         **MONICA R. SKANES, ESQ.**
Suite 1900                                 **NORMA G. MEACHAM, ESQ.**
Albany, New York 12260
Attorneys for all Defendants
except Defendants Madison
and Bryan

**E. STEWART JONES HACKLER MURPHY, LLP**
28 Second Street
Troy, New York 12180
Attorneys for Defendant Bryan

**E. STEWART JONES, JR., ESQ.**
**THOMAS J. HIGGS, ESQ.**

**SCULLIN, Senior Judge**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

These consolidated actions involve constitutional challenges to an April 3, 2013 reduction in force ("RIF"), whereby the New York State Thruway Authority and New York State Canal Corporation (collectively "Defendants") eliminated approximately 198 employees represented by New York State Thruway Employees Local 72 and the Civil Service Employees Association, Inc., Local 1000, AFSCME, AFL-CIO (collectively "Plaintiffs"). Pending before the Court are Defendants' joint motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure, *see* Dkt. No. 114;[1] Defendant Madison's motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure based on qualified immunity, *see* Dkt. No. 116; and Plaintiffs' joint motion for partial summary judgment against Defendants New York State Thruway Authority, New York State Canal Corporation, and all individual Defendants in their official capacities only based on their First Amendment targeting theory in

---

[1] Defendants also moved for summary judgment with regard to Plaintiffs' claims against Defendant Milstein in his individual capacity based on the doctrine of qualified immunity. *See* Dkt. No. 114.

the first count of their complaint under Rule 56 of the Federal Rules of Civil Procedure, *see* Dkt. No 120.[2]

## II. BACKGROUND

Defendant New York State Thruway Authority is a statutorily created public corporation, *see* N.Y. Pub. Auth. L. § 352, with the "power to finance, construct, reconstruct, improve, develop, maintain [and] operate" the New York State Thruway, *see* N.Y. Pub. Auth. L. at § 353. Defendant New York State Canal Corporation is a subsidiary corporation of Defendant New York State Thruway Authority. *See* N.Y. Pub. Auth. L. § 1005-b.

In the decade preceding the RIF at issue in this case, Defendants faced significant financial pressure that increased their debt burden from $1.3 billion to $3.2 billion. *See* Dkt. No 114-78 at 3. The continuing need for reconstructing the aging thruway and canal system, declining traffic and toll revenues due to the 2008 recession and high fuel prices, and spiraling health insurance costs for employees worsened Defendants' financial situation. *See id.* In response, Defendants implemented several cost-saving measures, including withholding a series of salary increases for managerial/confidential ("M/C") employees who are not affiliated with the Plaintiff unions. *See id.* at 4-5. Defendants estimate that these steps saved approximately $6.4 million. *See id.* at 4.

Despite the savings recognized through these cost-saving measures, Defendants determined that they needed to reduce labor costs further. *See id.* Salaries and benefits made up approximately 95% of Defendants' operating budget. *See id.* Defendants thus sought

---

[2] Plaintiffs also filed a joint motion for class certification under Rule 23 of the Federal Rules of Civil Procedure. *See* Dkt. No. 97. The Court will address that motion separately.

concessions from unionized workers when the collective bargaining agreements ("CBAs") with Plaintiffs expired on June 30, 2012. *See id.* at 5. In conjunction with the start of negotiating a new CBA, Defendants announced that they were planning an RIF for April, 2013 to achieve savings if negotiations were unsuccessful. *See id.* Defendants' strategy was to leverage the layoffs to encourage the unions to agree to a new CBA that would require unionized employees to pay a portion of their health insurance costs. *See* Dkt. No. 120-8 at 5-6.

Plaintiffs and Defendants could not agree on a new CBA, and thus Defendants executed the RIF as planned. *See id.* at 7. "The Thruway Authority identified positions targeted for layoff under the RIF plan by allocating costs amongst each of the bargaining units in proportion to the savings that the [Defendants were] looking to achieve in the unionized workforce." *See* Dkt. No. 129 at ¶ 146. Originally the RIF was supposed to save approximately $20 million annually; however, Defendants calculated that the RIF resulted in only $9 million in savings for 2013. *See* Dkt. No. 114-78 at 5. If Defendants had achieved their most important objective in bargaining -- namely, getting all employees to pay a percentage of their health insurance costs -- the savings would have been approximately $6.69 million. *See* Dkt. No. 120-8 at 7.

Following the RIF, Plaintiff Civil Service Employees Association, Inc., Local 1000, AFSCME, AFL-CIO filed two actions against Defendant Authorities and a number of executives and board members in their individual and official capacities on August 2, 2013. Almost a year later, Plaintiff New York State Thruway Employees Local 72 filed an action against Defendant Thruway Authority and a number of the same individuals in their individual and official

capacities on June 17, 2014.  The Court consolidated these three actions on October 2, 2014.[3]

*See* Dkt. No. 45.

In these consolidated cases, Plaintiffs assert causes of action pursuant to 42 U.S.C.

§ 1983 and New York law.  First, Plaintiffs allege that Defendants coerced Plaintiff CSEA into

giving up its rights to negotiate a CBA by threatening layoffs and that Defendants intentionally

directed their demands for concessions and threats of termination to union-represented

employees only.  Therefore, according to Plaintiffs, Defendants' action in terminating union-

represented employees violated those employees' right to associate with their union in violation

of the First Amendment to the United States Constitution by retaliating against Plaintiffs for

engaging in union activity and by targeting Plaintiffs for layoffs because of their union

affiliation.

Second, Plaintiffs allege that Defendants violated the Fourteenth Amendment's Equal

Protection Clause by illegally targeting Plaintiffs for layoffs based on their status as union-

represented employees. Further, they contend that Defendants' actions were arbitrary, irrational,

and deprived Plaintiffs of their rights to substantive due process.

Third, Plaintiffs allege that Defendants acted under color of state law to impair the

contractual rights of Plaintiff CSEA, which violated the Contract Clause of the United States

Constitution.[4]

---

[3] The parties have stipulated to the dismissal of all claims against the individual Defendants in
their individual capacities with the exception of the claims against Defendants Madison and
Milstein.

[4] Plaintiffs' complaint in *New York State Thruway Emps. Local 72 v. New York State Thruway
Auth.*, No. 1:14-CV-1043 (FJS/CFH), did not raise a Contracts Clause claim.

Finally, Plaintiffs allege that Defendants violated Article I, § 17 of the New York State Constitution by depriving employees of their right to organize.

Plaintiffs have indicated that, "[t]o streamline these cases, and because the First Amendment and Equal Protection claims will provide the plaintiffs and the class with full relief, plaintiffs have decided not to further pursue the Due Process, the Contract Clause or the New York State Law claims." *See* Dkt. No. 132-6 at 8 n.1. In light of this statement, the Court dismisses these claims. Therefore, Plaintiffs' remaining claims are those they assert under the First Amendment and under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.[5]

Plaintiffs' Fourteenth Amendment Equal Protection Clause claim and their First Amendment targeting claim raise identical issues, *i.e.*, whether Defendants unconstitutionally singled out Plaintiffs for inclusion in the RIF because of their status as union-represented employees. To resolve these claims, the Court must answer two questions: (1) Are Plaintiffs members of a protected class? and (2) Can Defendants justify their actions under the applicable level of judicial scrutiny?


### III. DISCUSSION

**A.      Standard of review**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In other words, an entry of summary judgment is appropriate "against a party

---

[5] The Court finds that these two causes of action are duplicative; and, therefore, it will analyze these claims together.

who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[I]n ruling on a motion for summary judgment, the district court is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments[.]" *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996) (citations omitted).


**B.      Targeting theory of liability**

As briefly outlined above, Plaintiffs argue that Defendants violated their "First and Fourteenth Amendment rights by singling out union-represented employees in making the layoff determinations associated with the RIF based solely on the fact that such employees were union-represented." *See* Dkt. No. 120-8 at 12 (citing *State Emp. Bargaining Agent Coal. v. Rowland*, 718 F.3d 126 (2d Cir. 2013) ("*Rowland*")). According to Plaintiffs, in *Rowland*, the Second Circuit "definitively determined whether, and under what circumstances a public entity's employment decisions violate the right to associate in unions." *See id.* at 13. Plaintiffs assert that "conditioning public employment on union membership is subject to strict scrutiny and can only be done if the government has a vital interest in doing so." *See id.* (citing *Rowland*, 718 F.3d at 132-33). Therefore, Plaintiffs argue that "the law of this Circuit is set -- a public employer like [Defendants] may not take adverse action against its employees based upon a protected First Amendment association absent a compelling state interest that is implemented in the least restrictive manner." *See id.* at 14 (citing *Rowland*, 718 F.3d at 133-35).

Defendants, on the other hand, assert that the Second Circuit decided *Rowland* on "stipulated facts, in which defendants admitted to the 'targeted' termination of about 2,800 Connecticut state workers specifically because of 'their union membership.'" *See* Dkt. No. 114-78 at 13-14 (quoting *Rowland*, 718 F.3d at 129). Defendants contend that, "[f]or *Rowland* to apply, Plaintiffs must first establish that [Defendants] intentionally and exclusively terminated, or eliminated the positions of, union members . . . and that non-union members who were not 'targeted' were indistinguishable, except for union membership." *See id.* at 14 (citing *Rowland*, 718 F.3d at 135).

As is clear from the preceding discussion, the parties' principal dispute is whether *Rowland* provides the appropriate framework to decide this case.

### 1. *Rowland's applicability to this case*

*Rowland* involved a labor dispute between the State Employees Bargaining Agent Coalition ("SEBAC") and Connecticut. *See State Emps. Bargaining Agent Coal. v. Rowland*, 718 F.3d 126, 129-30 (2d Cir. 2013). SEBAC is a coalition of thirteen state public employee unions representing approximately 40,000 state employees. *See id.* at 129. In November 2002, the defendants met with SEBAC and sought concessions under the plaintiffs' Collective Bargaining Agreement ("CBA"). *See id.* at 130. "Defendants advised plaintiffs that unless they agreed to these concessions, defendants would fire approximately 3000 unionized state employees." *Id.* According to the stipulated facts, "defendants 'intentionally directed their demands for health care and pension concessions (and their corresponding threats of termination if the concessions were not granted) solely to state union employees.'" *Id.* (quotation omitted).

SEBAC refused to agree to all of the proposed concessions but offered alternative concessions, which was its right under Connecticut Law. *See id.* (citing Conn. Gen. Stat. § 5–272(c)). "In December 2002, defendants ordered the firing of approximately 2800 unionized state employees." *Id.* Importantly,

> [n]o non-union workers were fired. While the fired employees were told that they were being laid off due to economic necessity caused by the state's fiscal year 2003 budget deficit, the firings in fact "had minimal effect" on the state's fiscal year 2003 expenses, and "were ordered as a means of trying to compel the plaintiff unions to agree to the concessions demanded." . . . Defendants advised plaintiffs that the 2003 firings would be rescinded if plaintiffs agreed to the proposed concessions.

*Id.* (internal quotation and footnote omitted).

SEBAC sued the governor and other state officials for, among other things, violation of the plaintiffs' right to free association by targeting them for layoffs based solely on their union membership. *See id.* at 131. The parties cross-moved for summary judgment on liability. *See id.* Furthermore, "the parties submitted a Joint Rule 56 Statement, and stipulated that the facts therein would govern the cross-motions for summary judgment." *Id.* The plaintiffs appealed after the district court granted the defendants' motion for summary judgment. *See id.*

The Second Circuit began its analysis by recognizing that "[t]he right to free association is 'a right closely allied to freedom of speech and a right which, like free speech, lies at the foundation of a free society.'" *Id.* at 132 (quoting *Shelton v. Tucker*, 364 U.S. 479, 485-86, 81 S. Ct. 247, 5 L. Ed. 2d 231 (1960)) (other citation omitted). "Included in this right to free association is the right of employees to associate in unions." *Id.* (citing *Thomas v. Collins*, 323 U.S. 516, 534, 65 S. Ct. 315, 89 L. Ed. 430 (1945)). The Second Circuit noted that it had previously stated that it could not "'be questioned that the First Amendment's protection of

speech and associational rights extends to labor union activities.'" *Id.* (quoting *Conn. State Fed'n of Teachers v. Bd. of Educ. Members*, 538 F.2d 471, 478 (2d Cir. 1976)) (other citation omitted).

However, the Second Circuit understood that it was breaking new ground in *Rowland*, recognizing that it "ha[d] never articulated a standard for determining whether, and under what circumstances, a public entity's employment decisions violate this right to associate in unions." *Id.* Thus, for guidance, the Second Circuit turned to the well-established case law concerning a person's right to associate with political parties. *See id.* For instance, the Second Circuit noted that the Supreme Court had stated in *Rutan v. Republican Party of Illinois* "that government employers may not 'condition [ ] hiring decisions on political belief and association . . . unless the government has a vital interest in doing so.'" *Id.* (quoting 497 U.S. 62, 78, 110 S. Ct. 2729, 111 L. Ed. 2d 52 (1990)) (citing *Elrod v. Burns*, 427 U.S. 347, 372-73, 96 S. Ct. 2673, 49 L. Ed. 547 (1976) (holding that public employees who alleged they were discharged because they were not members of the sheriff's political party stated a First Amendment claim)) (other citation omitted). The Second Circuit discussed the Supreme Court's concern "that the government would 'wield[] its power to interfere with its employees' freedom to believe and associate,' *id.* at 133 (quoting *Rutan*, 497 U.S. at 76, 110 S. Ct. 2729), and noted that 'conditioning public employment on the provision of support for the favored political party "unquestionably inhibits protected belief and association[,]"'" *id.* (quoting [*Rutan*, 497 U.S.] at 69, 110 S. Ct. 2729 (quoting *Elrod*, 427 U.S. at 359, 96 S. Ct. 2673)). The Second Circuit also recognized that hiring based on political party affiliation is "subject to strict scrutiny and must be 'narrowly tailored to further vital government interests.'" *Id.* (quoting *Rutan*, 497 U.S. at 74, 110 S. Ct. 2729) (other citation omitted).

Turning to the issue at hand, the Second Circuit reasoned that "[c]onditioning public employment on union membership, no less than on political association, inhibits protected association and interferes with government employees' freedom to associate." *Id*. Consequently, "[g]iven the well-established principle that union activity is protected by the First Amendment, and the applicability of the reasoning in the political patronage cases to union membership, [the Second Circuit held] that *Rutan*'s heightened scrutiny requirement applies to employment decisions based on union membership." *Id*. at 134 (footnote omitted). Therefore, the Second Circuit examined whether the terminations in *Rowland* were "'narrowly tailored to further vital government interests.'" *Id*. at 135 (quoting *Rutan*, 497 U.S. at 74, 110 S. Ct. 2729) (footnote omitted).

The defendants in *Rowland* conceded that they intentionally fired only union members in 2003. *See id*. at 134-35. The defendants argued "that the State needed to reduce the cost of its work force, and that since plaintiffs refused the proposed CBA concessions defendants were forced to lay off union workers to do so." *Id*. at 135. The Second Circuit found that the firings were not tailored to reduce the cost of the work force but instead "'had minimal effect on the State's [fiscal year 2003] expenses.'" *Id*. (quotation omitted). Furthermore, the defendants stipulated "that the savings realized from the 2003 firings did not correlate to the concessions requested from the unions." *Id*. (citation omitted)

In addition, and more importantly according to the Second Circuit, the defendants did not show "why the State's fiscal health required firing only *union members*, rather than implementing membership-neutral layoffs." *Id*. The stipulated facts showed that all employees -- whether or not they belonged to unions -- received the same health care and pension benefits. *See id*. Indeed, "[n]othing in the stipulation provide[d] any support for an argument that union members

cost more, provided fewer services, or were distinguishable from their non-union coworkers in any way other than their membership itself." *Id*. Rather than target the most expensive, or least valuable employees, the layoffs were predicated on union membership alone. *See id*.

According to the Second Circuit, the defendants' best argument was that the firings were a means to compel the union to agree to concessions, which would reduce the long-term costs of state government. *See id*. at 135-36. The Second Circuit recognized that reducing the long-term cost of state government was "arguably a vital government interest." *Id*. at 136. However, the Second Circuit found that the defendants failed to offer any evidence of narrow tailoring. *See id*. In so holding, the Second Circuit recognized a state's ability to bargain hard with state employees. *See id*. However, the fatal flaw of the defendants' plan was that they effectively penalized union members for no other reason than their union membership, rather than implementing a neutral plan. *See id*. As the Supreme Court noted in *Elrod v. Burns*, 427 U.S. 347 (1976) "conditioning the retention of public employment on the employee's" association with a certain group "must further some vital government end by a means that is least restrictive of freedom of belief and association in achieving that end, and the benefit gained must outweigh the loss of constitutionally protected rights." *Id.* at 363 (footnote omitted). According to the Second Circuit in *Rowland*, the defendants "made no such showing . . . to justify terminating only union employees." *Rowland*, 718 F.3d at 136.

Defendants in this case argue that *Rowland* is inapplicable because the Second Circuit decided that case on stipulated facts, including the defendants' admission that they laid off employees "specifically because of 'their <u>union membership</u>.'" *See* Dkt. No 128 at 6-7 (quoting *Rowland*, 718 F.3d at 129). Thus, Defendants argue that *Rowland* only applies if Plaintiffs can establish intentional and exclusive termination of union members. *See id.* at 7. In that regard,

Defendants note that the targeted layoffs in *Rowland* were limited to full-fledged union members. *See id*. at 5-6. Here, however, the undisputed facts show that some "agency shop fee payors" also lost their jobs in the April RIF.[6] *See id*. at 5. Accordingly, Defendants contend that they did not violate the First Amendment right to association protected in *Rowland* because the group they targeted for layoffs in the April RIF included "agency shop fee payors" *and* union members.

Defendants' pseudo-semantic argument does not acknowledge that the *Rowland* court described the plaintiffs in several different ways, including the generic term "unionized workforce" and only stated that "[n]o non-union workers were fired," which may or may not have included agency shop fee payors. *Rowland*, 718 F.3d at 130. Although it is true that there is nothing in the Second Circuit's decision that indicates "that any agency shop fee payors were included in the group of 'unionized state employees' who were fired," *see* Dkt. No. 128 at 7, there is equally nothing to indicate that they were not. Furthermore, the defendants in *Rowland* appeared to concede that agency shop fee payors were included within the group of unionized workers who were laid off in a footnote to their petition for a *writ of certiorari* to the United States Supreme Court. Those defendants stated that, "[r]egardless of formal union membership, a union represents all employees in a bargaining unit, and all bargaining unit members are subject to their respective union's collective bargaining agreement with the State." *Rowland v. State Employees Bargaining Agent Coalition*, No. 13-480, 2013 WL 5652564, *3 n.1 (U.S. Oct.

---

[6] The parties dispute how to characterize agency shop fee payors. Defendants claim that "[a]gency shop fee payors are individuals who occupy positions within a recognized bargaining unit, but who have affirmatively decided not to join the union." *See* Dkt. No 120-8 at 5. Whereas, Plaintiffs claim that "agency fee payors are individuals who occupy positions in the bargaining unit but who have not signed a union membership card." *See* Dkt. No. 135 at 5. This distinction is insignificant because the bargaining units Defendants targeted in their layoffs undeniably represent all agency shop fee payors.

11, 2013).  Thus, it appears that neither party in *Rowland* differentiated between the levels of membership within the union, focusing rather on the singular fact that the individuals were part of a bargaining unit, *represented* by a union, as Plaintiffs do here.

More importantly, the inclusion of agency shop fee payors does not change the application of *Rowland* to the current factual situation.  *Rowland* was fundamentally concerned with the use of targeted layoffs to penalize and pressure the bargaining coalition to accept the defendants' concessions to sign a new CBA.  *See Rowland*, 718 F.3d at 136.  In other words, the targeting theory announced in *Rowland* is a means to protect union-represented individuals during the bargaining process.  *See id.* (stating that, "for a state to fire union members -- and union members alone -- in the hope of ultimately achieving economic concessions is little different from refusing to hire union members in the first place").  At its heart, *Rowland* condemns executing targeted layoffs to further economic bargaining because of the likely negative effect on a person's freedom to associate with a union; unless, of course, the layoffs are narrowly tailored to advance a vital interest.  *See id*.

In sum, the Court finds that the frame-work that the Second Circuit announced in *Rowland* applies to this case and further finds that the April 2013 RIF impacted a protected class of employees, *i.e.*, those employees whom the Plaintiff unions represented during collective bargaining.   Therefore, the Court must next consider whether Defendants narrowly tailored the April RIF to advance a vital governmental interest.

### 3. Judicial scrutiny

The Second Circuit in *Rowland* acknowledged that it is possible for the government to show that a layoff was narrowly tailored to further vital government interests, stating that

"compel[ling] the unions to agree to concessions, which in turn would reduce the long-term costs of state government," is "arguably a vital government interest." *Id*. at 135-36. The Second Circuit suggested that to succeed, the defendants must show, among other things, that the layoffs had more than a minimal effect on expenses and that the savings achieved correlated to the concession requested from the unions. *See id.* Furthermore, the defendants must prove that the "State's fiscal health required firing only union members, rather than implementing membership-neutral layoffs." *Id*. at 135. The Second Circuit further stated:

> Unquestionably, layoffs applied generally without discriminating against union members would also have brought dramatic pressure on SEBAC, by terminating the employment of workers on whose behalf the unions were negotiating; this is particularly so in that 75% of such layoffs could be expected to fall on union members, who made up that proportion of the work force. But such layoffs, in contrast to the ones here challenged, would not have penalized employees because of their union membership.

*Id*. at 136.

Thus, for Defendants to prevail in this case they must show that the layoffs were not meant to penalize union employees but were instead narrowly tailored to reduce long-term costs of state government.

In the instant action, Plaintiffs maintain that the "facts in this case are on all fours with those of the [*Rowland*] case." *See* Dkt. No. 120-8 at 14. Specifically, Plaintiffs contend that, like the defendants in *Rowland*, Defendants here cannot show that the layoffs were sufficiently tailored to a compelling interest. *See id*. at 18-19. For support, Plaintiffs argue that the layoffs had minimal effect on the overall budget; Defendants never considered coming to an agreement with Plaintiffs to eliminate fewer positions; and Defendants never considered unilaterally increasing health insurance contributions for the M/C employees. *See id.* at 19.

In addition, Plaintiffs contend that notably lacking from Defendants' arguments is any explanation of why a neutral layoff would not have furthered their goal to pressure the unions to agree to concessions. In *Rowland*, for instance, the Second Circuit stated that general layoffs would have also brought pressure on the defendants -- because 75% of the layoffs would be expected to fall on union members. *See Rowland*, 718 F.3d at 136. Here, an even higher percentage of the total workforce constituted unionized workers. *See* Dkt. No. 135 at 3 n.1 (unionized workers constitute 92% of all employees and M/C employees constitute 8%). Thus, Plaintiffs argue that a neutral layoff scheme would have likely brought dramatic pressure on Plaintiffs to agree to concessions and would have been "unquestionably" constitutional. *See, e.g., Rowland*, 718 F.3d at 136.

Furthermore, Plaintiffs contend that the savings that Defendants hoped to achieve from the RIF were far greater than what they were willing to accept through bargaining. *See* Dkt. No. 120-8 at 19-20. This fact similarly played a role in *Rowland*. *See Rowland*, 718 F.3d at 135 (stating, "the savings realized from the 2003 firings did not correlate to the concessions requested from the unions"). In other words, the savings realized by the layoffs ($9 million) was less than what they hoped to achieve from layoffs ($20 million) but more than what they would have been willing to give up had the employees agreed to the health insurance concessions ($6.69 million).

That being said, the facts in *Rowland* that led the Second Circuit to reject the defendants' arguments vary in some important respects from those in the present case. In *Rowland*, both parties stipulated that the layoffs were exclusively targeted to penalize unionized employees and had minimal effect on the state budget. *See id.* at 136 (stating that "defendants have offered no evidence of narrow tailoring"). In contrast, Defendants here offer several reasons why the RIF was narrowly tailored. First, the RIF did not include an entire sub-group of unionized

employees, namely, part-time toll collectors ("PTTCs").  *See* Dkt. No. 114-78 at 16; *see also* Dkt. No. 140, Defendants' Statement of Undisputed Facts, at ¶¶ 182-83.  Defendants did not include this group because PTTCs earned lower wages and were eligible for fewer benefits than full-time toll collectors.  *See* Dkt. No. 140 at ¶ 187.  Thus, unlike in *Rowland* where the defendants fired union members indiscriminately, Defendants here chose to save the jobs of the least expensive.[7]  *See Rowland*, 718 F.3d at 135.

Moreover, unlike in *Rowland* where the defendants could not show "why the State's fiscal health required firing only *union members*, rather than implementing membership-neutral layoffs," *id.*, Defendants here limited the scope of the RIF to unionized members because they had already "obtained about $6.4 million in savings" from the M/C employees.  *See* Dkt. No. 114-78 at 18.

Thus, the Court finds that there are genuine disputes of material facts regarding several material issues, including the following: (1) whether the state fiscal crisis required these layoffs; (2) whether neutral layoffs would have achieved similar savings; and (3) whether Defendants' financial needs were narrowly tailored to the savings anticipated in the RIF.  In sum, the uniquely factual nature of Plaintiffs' claims and the significant material disputes regarding whether Defendants narrowly tailored the RIF to achieve a compelling interest preclude the granting of summary judgement in this case in favor of either party.

---

[7] Plaintiffs argue that excluding PTTCs is irrelevant to determine Defendants' motivation for the layoffs.  *See* Dkt. No 132-6 at 21.  Plaintiffs, however, miss the point of why excluding PTTCs is a critical factor; it has nothing to do with Defendants' motivation but, instead, shows that Defendants tailored the RIF to the most expensive employees.

## C.     First Amendment retaliation

In *Rowland*, which involved substantially analogous factual and legal allegations, the court declined to consider whether the defendants might be liable under a First Amendment retaliation theory after determining that they targeted the plaintiffs for layoffs based on union membership.  The Second Circuit did so because the resolution of those ancillary issues became unnecessary to provide the plaintiffs full relief after deciding in their favor under the targeting theory.  *See id.* at 136 n.13.

In so holding, the court in *Rowland* also expressed doubts that the plaintiffs would succeed under their First Amendment retaliation theory, stating that

> Plaintiffs also allege that their termination was in retaliation for their speech on matters of public concern, proscribed by *Pickering v. Board of Education*, 391 U.S. 563, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968).  We believe that the case is better conceptualized under *Rutan*.  We have noted that "for the *Pickering* line of cases to apply, there must be an expression of views."  *Morin v. Tormey*, 626 F.3d 40, 43 (2d Cir. 2010).  Plaintiffs have not identified any expression of views by the laid-off workers, but instead allege that defendants retaliated against them because they refused defendants' proposed concessions.  Similar to the plaintiff in *Morin*, plaintiffs here "did not initiate the expression of any views, nor did [they] volunteer comments on any issues, whether of public or private citizen concern. [They] just said, 'No.'" *Id.* at 44.  "In short, the issue in this case is whether [plaintiffs] could be retaliated against based on" their union "affiliation (or non-affiliation), not whether [they] could be retaliated against based on any protected speech," and the case is therefore "plainly governed by the *Elrod/Branti/Rutan* trilogy."

*Rowland*, 718 F.3d at 136 n.13 (internal citation omitted).

The same is true in this case.  Plaintiffs do not allege that they expressed any views; thus, the primary issue in this case, as it was in *Rowland*, is whether Defendants targeted layoffs against Plaintiffs because of their union affiliation.  Therefore, the *Elrod/Branti/Rutan/Rowland* quartet governs this case; and, accordingly, the Court grants Defendants' motion for summary judgment as to Plaintiffs' First Amendment retaliation claim.

**D.      Qualified immunity**

"The doctrine of qualified immunity protects government officials from liability for civil damages 'unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct.'" *Wood v. Moss*, 134 S. Ct. 2056, 2066-67 (2014) (quoting *Ashcroft v. al–Kidd*, 563 U.S. [731, 735], 131 S. Ct. 2074, 2080, 179 L. Ed. 2d 1149 (2011)).  In that regard, "for a right to be 'clearly established,' the 'contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *McGowan v. United States*, 825 F.3d 118, 124 (2d Cir. 2016) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)).  To determine whether a right is clearly established, the Court considers "Supreme Court and Second Circuit precedent as it existed at the time of the challenged conduct." *Id.* (citing *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2014)).  Furthermore, "the need for 'clearly established' law is satisfied if the law on the subject was defined at the time with reasonable clarity or clearly foreshadowed in rulings of the Supreme Court or the Second Circuit, so that the defendant should have understood that her conduct was unlawful." *Lynch v. Ackley*, 811 F.3d 569, 578-79 (2d Cir. 2016) (citations and footnote omitted).

At the time the alleged violation occurred, *i.e.*, April 2013, Second Circuit and Supreme Court case law did not clearly establish that targeting a layoff at union represented individuals violated those individuals' constitutional rights.  As the Second Circuit stated in *Rowland*, it had "never articulated a standard for determining whether, and under what circumstances, a public entity's employment decisions violate this right to associate in unions." *Rowland*, 718 F.3d at 132.  Furthermore, as *Rowland* court pointed out, although "it c[ould not] 'be questioned that the

First Amendment's protection of speech and associational rights extends to labor union activities,'" *id.* (quotation and citation omitted); the contours of the right as it related to a public entity's employment decision did not clearly foreshadow *Rowland*'s result. Therefore, the Court finds that, as a matter of law, Defendants Madison and Milstein are entitled to qualified immunity with regard to Plaintiffs' claims against them in their individual capacities.

## IV. CONCLUSION

Having reviewed the entire file in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion for summary judgment, *see* Dkt. No. 114, is **DENIED** as to Plaintiffs' First Amendment targeting claim and **GRANTED** as to Plaintiffs' First Amendment retaliation claim; and the Court further

**ORDERS** that, based on Plaintiffs' statement that they have decided not to pursue their Due Process, Contract Clause and state-law claims, *see* Dkt. No. 132-6 at 8 n.1, these claims are **DISMISSED**; and the Court further

**ORDERS** that Plaintiffs' motion for partial summary judgment, *see* Dkt. No. 120, is **DENIED**; and the Court further

**ORDERS** that Defendant Madison's and Defendant Milstein's motions for summary judgment based on qualified immunity, *see* Dkt. Nos. 114, 116, are **GRANTED**; and Plaintiffs' claims against Defendants Madison and Milstein are **DISMISSED** insofar as Plaintiffs assert those claims against them in their individual capacities; and the Court further

**ORDERS** that Plaintiffs' joint motion for class certification, *see* Dkt. No. 97, is referred to Magistrate Judge Hummel for proposed findings of fact and recommendations for the disposition of said motion.

**IT IS SO ORDERED.**

Dated: April 14, 2017
      Syracuse, New York

                                 Frederick J. Scullin, Jr.
                                 Senior United States District Judge